UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

MARYKATHRYN DOHENY and TONY
DEGRUCCIO, *individually and on behalf of
all others similarly situated individuals*,

                              Plaintiffs,

v.

INTERNATIONAL BUSINESS
MACHINES, CORP. and KYNDRYL
HOLDINGS, INC.,

                              Defendants.

No. 23-CV-3962 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs MaryKathryn Doheny and Tony DeGruccio—individually and on behalf of those

similarly situated—bring this action against their former employers, Kyndryl Holdings, Inc.[1] and

International Business Machines, Corp. ("IBM"), alleging violations of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 623(a), (d), and the California Fair Employment and

Housing Act ("FEHA"), Cal. Gov't Code §§ 12940(a), 12941, in connection with their layoffs.

Four plaintiffs have since opted into the suit as to the collective claim for age discrimination under

the ADEA, 29 U.S.C. § 623(a). Before the Court are Kyndryl's and IBM's motions to dismiss

Plaintiffs' amended complaint (the "Complaint").

Kyndryl's motion to dismiss is granted in part and denied in part. Doheny states a plausible

claim for age discrimination against Kyndryl under the ADEA, 29 U.S.C. § 623(a), based on both

---

[1] Kyndryl Holdings, Inc. argues that Plaintiffs improperly name it as a defendant because it is Kyndryl, Inc. that employed Plaintiffs. *See* Kyndryl's Mem. at 1 n.2, Dkt. No. 31. At this stage of litigation, however, the Court accepts as true the allegation that Kyndryl Holdings, Inc. employed Plaintiffs. *See Khan v. Yale Univ.*, 27 F.4th 805, 810 (2d Cir. 2022), *certified question answered*, 295 A.3d 855 (Conn. 2023).

individual disparate-treatment and pattern-or-practice theories of liability. Her remaining claims against Kyndryl are dismissed, as are all claims pertaining to DeGruccio and the opt-in plaintiffs. IBM's motion to dismiss is granted in full, and all claims against it are dismissed.

## BACKGROUND

The Court draws the following facts from the Complaint, documents appended to it, or incorporated in it by reference and accepts those facts as true for the purpose of the motions before it. *See Khan*, 27 F.4th at 810.

### I.   Plaintiffs Doheny and DeGruccio

Plaintiffs MaryKathryn Doheny and Tony DeGruccio, both in their 60s, were laid off from their jobs at Kyndryl, an IBM spin-off company, last year. Compl. ¶¶ 2, 4–5, 21, 26, Dkt. No. 8.

Doheny worked for IBM for 23 years as a certified client executive. *Id.* ¶ 4. She then began working for Kyndryl as director of global software in 2021, when Kyndryl spun off from IBM, taking over its managed infrastructure business. *Id.* ¶¶ 2, 17, 21. In March 2023, one day after she resolved a claim of discrimination against IBM, *id.* ¶ 22, she was laid off from Kyndryl as part of a "Resource Action," *id.* ¶ 21. At the time of her layoff, Doheny "was one of the oldest members of her team" and "had an excellent work record." *Id.* Upon learning of her layoff, Doheny "attempted to inquire about" open positions within Kyndryl but received no response. *Id.* ¶ 25.

DeGruccio worked for IBM for 22 years as a business development executive. *Id.* ¶ 5. Like Doheny, he began working for Kyndryl in 2021, serving as a services solutions leader. *Id.* He was laid off from Kyndryl in May 2023, despite his productivity. *Id.* ¶¶ 5, 26. Upon DeGruccio's layoff, his manager "told him [that] it [would be] futile to look for other positions" at Kyndryl because the company "was looking for younger employees or 'new blood.'" *Id.* ¶ 27. DeGruccio later

observed Kyndryl "summarily reject[ing]" qualified older employees for employment in open positions, while "actively" seeking to transfer younger ones. *Id*.

## II.   Kyndryl and IBM's Alleged Policies and Practices

Plaintiffs contend that their layoffs occurred in accordance with Kyndryl's "playbook of age discrimination." *Id*. ¶ 18. They allege that they were subject to its "polic[ies] and practices of targeting for layoff and disproportionately ending the employment of employees" aged 40 and older and "preventing those employees from consideration for other open internal Kyndryl positions for which they are qualified." *Id*. ¶ 33. Relying on recent reporting, Plaintiffs note that Kyndryl "recently laid off hundreds of employees, . . . app[arently] . . . includ[ing] a disproportionately high number of employees over the age of [40]." *Id*. ¶ 18. Of 420 U.S. workers recently tapped for possible layoff, for example, 156 employees with an average age of 55 were ultimately laid off; the remaining 264 workers, whose average age was 52, were transferred to other positions. *See* Thomas Claburn, *Leaked Kyndryl Files Show 55 was Average Age of Laid-Off US Workers*, The Register (May 24, 2023), https://www.theregister.com/2023/05/24/kyndryl_ibm_layoffs; Compl. ¶ 18.[2] Meanwhile, the average age of employees in Kyndryl's mainframe group is 35, and the median age for U.S. workers in the "data processing, hosting, and related services" and "computer systems design and related services" sectors is 37.0 and 40.8 respectively. Claburn, *supra* (quoting U.S. Bureau of Lab. Stat., *Employed Persons by Detailed Industry and Age*, Lab. Force Stat. from the Current Population Surv. (last modified Jan. 25, 2023), https://www.bls.gov/cps/aa2022/cpsaat18b.htm).[3]

---

[2] Plaintiffs do not append *The Register*'s reporting to the Complaint. However, the Court finds it incorporated by reference into the Complaint because the Complaint contains "a clear, definite, and substantial reference" to the reporting. *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020) (quoting *Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 537 (S.D.N.Y. 2018)).

[3] Relying on *The Register*'s reporting, Plaintiffs allege that the average age of Kyndryl's workforce is 35. Compl. ¶ 18. But the reporting in fact indicates that 35 is the average age of the workers in Kyndryl's *mainframe*

According to Plaintiffs, both Kyndryl and IBM are to blame for their treatment: Kyndryl has merely continued IBM's "playbook of age discrimination," Compl. ¶ 18, a choice they say IBM "has been involved in[] and is behind," *id*. ¶ 19. Plaintiffs observe that numerous allegations of age discrimination have been levied against IBM in recent years, playing out through court, administrative, and arbitration proceedings, as well as in the press. *Id.* ¶¶ 11–16. They also note several similarities and connections between Kyndryl and IBM. IBM and Kyndryl both label their layoffs "Resource Actions," and Kyndryl provided resources to its laid-off employees through IBM URLs. *Id*. ¶ 19. In addition, the severance package Kyndryl provided "to laid-off employees appears to be based on" IBM's severance package, employing the "same language, font, and spacing." *Id*.

### III.    Kyndryl's Separation Agreement

Included in Kyndryl's severance package was a separation agreement (the "Agreement"), *id*. ¶ 28, which DeGruccio and the four opt-in plaintiffs—Laurence Healy, Abram Mercedes, Margaret Allen, and Maura Wasson—executed, *see* Burkhardt Decl., Exs. 1–5, Dkt. Nos. 32-1 to 32-5.[4] Through the Agreement, the employees were "offered payments and benefits as part of a workforce rebalancing action that [they] otherwise would not have been entitled to receive." *E.g.*, *id*. Ex. 1 at 18. By signing it, they "agree[d] that the payments and benefits [they] [had] or [would] receive . . . [were] good and valuable consideration for entering into [it]." *Id*. § 8.

---

*group*. Claburn, *supra.* The reporting, incorporated into the Complaint by reference, controls. *See Williams v. Citibank, N.A*., 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008).

[4] Plaintiffs assert that "[w]hen laying off employees, Kyndryl . . . provided them with a severance agreement purporting to release most legal claims, including claims under the ADEA." Compl. ¶ 28. They further allege that deficiencies in the Agreement render it invalid. *See id.* ¶¶ 28–31. Kyndryl provided copies of the Agreement, including those signed by the opt-in plaintiffs, in support of its motion to dismiss. *See* Burkhardt Decl., Exs. 1–5. The Court deems the Agreement, including the copies of it, incorporated by reference into the Complaint. *See, e.g.*, *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002); *cf. Rusis v. Int'l Bus. Machs. Corp*., 529 F. Supp. 3d 178, 193 n.5 (S.D.N.Y. 2021) (considering incorporated by reference a company's standard separation agreement signed by opt-in plaintiffs but not appended to the pleadings).

The Agreement contained provisions on the release and arbitration of claims against Kyndryl. Section 2 of the Agreement sets forth a broad release of claims:

> By signing this Agreement, you release Kyndryl from ALL claims that you may have against it at the time of signing, . . . (EXCEPT FOR THOSE SPECIFICALLY IDENTIFIED IN SECTION 3),[5] . . . including, without limitation, and to the maximum extent permitted by law: any and all claims arising under any federal, state, local, or foreign law dealing with or regulating employment, including, but not limited to: (1) laws prohibiting discrimination or harassment based on . . . age . . . [and] (3) claims arising under . . . Age Discrimination in Employment Act of 1967 (ADEA).

*E.g.*, *id*. Ex. 1 § 2. Section 6 includes an arbitration requirement for individual claims and a bar on class or collective ones:

> You agree that any and all legal claims or disputes between you and Kyndryl that have not [been] or cannot be released by private agreement as a matter of law . . . will be resolved on an individual basis by private, confidential, final and binding arbitration according to the Kyndryl Arbitration Procedures and Collective Action Waiver . . . .
>
> To the maximum extent permitted by applicable law, you and Kyndryl agree that no Covered Claims may be initiated, maintained, heard, or determined on a multiparty, class action basis or collective action basis either in court or arbitration, and that you are not entitled to serve or participate as a class action member or representative, or collective action member or representative . . . .
>
> You further agree that if you are included within any class action or collective action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.

*E.g.*, *id*. Ex. 1 § 6. The Kyndryl Arbitration Procedures and Collective Action Waiver referenced in Section 6 address the confidentiality of any arbitration proceeding:

> Privacy and confidentiality are important aspects of arbitration. Only parties, their representatives, witnesses and necessary administrative staff of the arbitration forum may attend the arbitration hearing. The Arbitrator may exclude any non-party from any part of a hearing.
>
> To protect the confidentiality of proprietary information, trade secrets or other sensitive information, the parties shall maintain the confidential nature of the arbitration proceeding and the award. The parties agree that any information related

---

[5] Plaintiffs do not allege that the claims identified in Section 3 bear on the issues currently before the Court.

5

to the proceeding, such as documents produced, filings, witness statements or testimony, expert reports and hearing transcripts is confidential information which shall not be disclosed, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, brought by a party to this Agreement, a party's judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision by reason of this paragraph.

*E,g.*, *id.* Ex. 1 at 25. Lastly, Section 7 of the Agreement includes a severability clause:

If any part of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will not be affected in any way, except that if your release of claims or agreement to arbitrate Covered Claims is held to be unenforceable, then at its option Kyndryl may seek to recover to the maximum extent permitted by law the payments and value of benefits that you received under this Agreement.

*E,g.*, *id.* Ex. 1 § 7.

## IV.    The Complaint

Plaintiffs filed suit against Kyndryl and IBM on May 11, 2023, amending their complaint on May 23, 2023. In Count I, Doheny and DeGruccio assert an individual and collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a). Pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), the four opt-in plaintiffs have since joined Doheny and DeGruccio's suit as to the collective claim for age discrimination.[6] *See* Pls.' Mem. Support Mot. Issuance Notice, Ex. H, Dkt. No. 10-8; Pls.' Notice, Attachs. 1–2, Dkt. Nos. 23-1 to 23-2; Pls.' Notice, Attach. 1, Dkt. No. 28-1. In Count II, DeGruccio, a former California employee, asserts individual and class claims for age discrimination under the FEHA, Cal. Gov't Code §§ 12940(a), 12941. In Count III, Doheny asserts an individual claim for retaliation under the ADEA, 29 U.S.C.

---

[6] This case presents a situation where plaintiffs have opted into a collective action before the action is conditionally certified as collective. *See generally Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.10 (2d Cir. 2010) (observing that "nothing in the text" of the FLSA, 29 U.S.C. § 216(b), prevents plaintiffs from opting into a suit before notice to potential opt-in plaintiffs has been issued); *Xu v. Little Siam Corp.*, No. 17-CV-7342, 2018 WL 11452568, at *1 (S.D.N.Y. June 6, 2018) (concluding that a plaintiff may opt into an action before it is conditionally certified as collective).

§ 623(d). Both Kyndryl and IBM have moved under Federal Rule of Civil Procedure 12(b)(6) to

dismiss the Complaint for failure to state a claim.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege 'enough facts

to state a claim to relief that is plausible on its face.'" *Mirkin v. XOOM Energy, LLC*, 931 F.3d

173, 176 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim

is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). In determining whether a plaintiff has done so, a court may consider only

the "facts stated on the face of the complaint, . . . documents appended to [it] or incorporated in

[it] by reference, and . . . matters of which judicial notice may be taken." *Allen v. WestPoint–*

*Pepperell, Inc*., 945 F.2d 40, 44 (2d Cir. 1991). And while a court must accept all factual

allegations as true, it need not "credit conclusory allegations or legal conclusions couched as

factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020)

(quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)). "Accordingly, 'threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id*.

(quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

Both the ADEA and FEHA protect individuals aged 40 and older from intentional age

discrimination by their employers. *See* 29 U.S.C. §§ 623(a), 631(a); Cal. Gov't Code §§ 12926(b),

12940(a). Specifically, they prohibit employers from intentionally discriminating against

employees by discharging them or denying them privileges of employment because of their age.

*See* 29 U.S.C. § 623(a)(1); Cal. Gov't Code § 12940(a). They also prohibit employment practices

that are facially neutral but in reality fall more harshly on employees aged 40 and older. *See* 29 U.S.C. § 623(a)(2); Cal. Gov't Code § 12941; *Smith v. City of Jackson*, 544 U.S. 228, 232 (2005). As relevant here, the ADEA further bars employers from retaliating against employees who have opposed unlawful conduct under the ADEA or participated in an investigation, proceeding, or litigation under the ADEA. *See* 29 U.S.C. § 623(d).

Plaintiffs' assertions that Kyndryl and IBM violated these provisions rely on various theories of liability. The Court first addresses Kyndryl's motion to dismiss, followed by IBM's, navigating through Plaintiffs' theories along the way.

## I.      Claims Against Kyndryl

The Court begins with Doheny's individual and collective claim for age discrimination, as well as her individual claim for retaliation, both brought under the ADEA, 29 U.S.C. § 623(a), (d). It then considers DeGruccio's ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, claims and whether the collective claim for age discrimination under the ADEA survives as to the four plaintiffs who have opted into the suit. The Court concludes that the only claim against Kyndryl to survive is Doheny's age discrimination claim, which may proceed individually under a disparate-treatment theory of liability and collectively under a pattern-or-practice theory of liability.

### A.  Doheny's Age Discrimination Claim: Disparate Treatment

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to . . . privileges of employment[] because of such individual's age." 29 U.S.C. § 623(a)(1). Claims for age discrimination under this provision are commonly known as "disparate-treatment claims." *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Disparate treatment, "the most easily understood type of discrimination," occurs where

"[t]he employer simply treats some people less favorably than others because of their [protected status]." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). With disparate-treatment claims, "[p]roof of discriminatory motive is critical." *Id*.

A plaintiff may rely on two theories of liability to state a plausible disparate-treatment claim under the ADEA. She can allege an *individual* disparate-treatment claim for age discrimination, *see* 29 U.S.C. § 623(a)(1); *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609 (1993), or a *collective* disparate-treatment claim for age discrimination under a "pattern-or-practice" theory of liability,[7] *see, e.g.*, *Rodolico v. Unisys Corp*., 199 F.R.D. 468, 482 (E.D.N.Y. 2001); *see also Fisher v. Vassar Coll.*, 66 F.3d 379, 408 (2d Cir. 1995), *republished as amended at* 70 F.3d 1420 (2d Cir. 1995) (recognizing the pattern-or-practice theory of liability under the ADEA); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (holding that pattern-or-practice claims are not available to individual plaintiffs under Title VII).[8] A claim based on the pattern-or-practice theory of liability requires that "discrimination was the company's standard operating procedure." *Teamsters*, 431 U.S. at 336.

### 1.  Doheny's Individual Claim

For an individual disparate-treatment claim to survive a Rule 12(b)(6) motion, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her]," *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 86 (2d Cir. 2015), and (2) the employer would not have taken

---

[7] By incorporating Section 16(b) of the FLSA, 29 U.S.C. § 216(b), the ADEA "expressly authorizes employees to bring collective age discrimination actions 'in behalf of . . . themselves and other employees similarly situated.'" *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (quoting 29 U.S.C. § 216(b)).

[8] As a general matter, the language of Title VII and the ADEA are sufficiently similar such that courts typically apply interpretations of Title VII to the ADEA. *See Smith*, 544 U.S. at 233 ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes. We have consistently applied that presumption to language in the ADEA that was 'derived *in haec verba* from Title VII.'" (citation omitted) (quoting *Lorillard v. Pons*, 434 U.S. 575, 584 (1978))).

the adverse action but for her age, *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021). *See also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (concluding that a plaintiff "need not allege facts establishing each element of a *prima facie* case of discrimination" at the pleading stage). "[E]vidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment" claim. *Chin*, 685 F.3d at 150.

Doheny plausibly alleges two "adverse action[s]" taken against her by Kyndryl. *Vega*, 801 F.3d at 85. First, she alleges that Kyndryl laid her off. Compl. ¶ 21. Termination, of course, is an adverse employment action. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006). Second, she alleges that Kyndryl "prevent[ed] [her] from obtaining open positions at the company" by failing to respond to her inquiries about them. Compl. ¶ 25. Where, as a "privilege[]" of employment," 29 U.S.C. § 623(a)(1), an employer typically fields employee transfer requests upon layoffs, its refusal to do so for some employees can constitute an adverse employment action, *see Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 615–16 (7th Cir. 2000), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) ("A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a *prima facie* case of discrimination." (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001))).

That said, Doheny only plausibly alleges that Kyndryl would have taken the first of those adverse actions "but for" her age. *Lively*, 6 F.4th at 303. The alleged circumstances surrounding Doheny's layoff do render it plausible that she would not have been laid off but for her age. In her early 60s and "one of the oldest members of her team," Doheny was suddenly laid off despite her

10

"excellent work record." Compl. ¶ 21. Meanwhile, Kyndryl "laid off hundreds of employees, . . . app[arently] . . . includ[ing] a disproportionately high number of employees over the age of [40]." *Id*. ¶ 18. One "Resource Action," for example, resulted in the layoff of 156 people, whose average age was 55. *Id*.; *see* Claburn, *supra*. By contrast, the average age of workers in Kyndryl's mainframe group is 35, and the median age of U.S. workers in the "data processing, hosting, and related services" and "computer systems design and related services" sectors is about 37 and 41, respectively. Claburn, *supra* (quoting U.S. Bureau of Lab. Stat., *supra*).

The alleged circumstances surrounding Doheny's transfer efforts, however, render it implausible that she would have been prevented from transferring "but for" her age. *Lively*, 6 F.4th at 303. Doheny alleges that, consistent with its practice, Kyndryl "prevent[ed]," Compl. ¶ 25, her from transferring at the same time that it "actively sought to place younger employees in other open positions," *id*. ¶ 27. She also asserts that DeGruccio's "manager . . . told him it was futile to look for other positions at the company, as Kyndryl was looking for younger employees or 'new blood.'" *Id*. Yet according to the reported statistics on which Doheny otherwise relies, of the 420 employees originally identified for layoff, 264 employees, whose average age was 52, were transferred to a new position. *See* Claburn, *supra*. Kyndryl thus appears to have transferred many employees aged 40 and older; Doheny was just not among that group.

Accordingly, Doheny states a plausible individual disparate-treatment claim as to her layoff but not as to her prevented transfer.

### 2. Doheny's Collective Claim

For a pattern-or-practice claim under the ADEA to survive a Rule 12(b)(6) motion, a plaintiff must plead facts plausibly supporting a "minimal inference," *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015), that "[intentional age] discrimination was the company's

standard operating procedure," *Teamsters*, 431 U.S. at 336; *see Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 430 (S.D.N.Y. 2014); *see also Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 33 (2d Cir. 2016) (applying the "minimal inference" requirement to an ADEA claim). Statistics alone may be sufficient to state a plausible pattern-or-practice claim. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977); *United States v. City of New York*, 717 F.3d 72, 84 (2d Cir. 2013). But they are unnecessary so long as a plaintiff alleges facts "that allow the court to infer a pattern of discrimination." *Barrett*, 39 F. Supp. 3d at 430. To infer such a pattern without statistical support, "more than two acts [of discrimination] will ordinarily be required." *Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981). "[W]ith respect to motions to dismiss, courts have held that three instances of discrimination were insufficient to state a plausible pattern-or-practice claim, as were six instances, but that eleven or twelve instances were sufficient." *Barrett*, 39 F. Supp. 3d at 431 (citations omitted). It follows, of course, that plaintiffs can allege a plausible claim by relying on a combination of statistical and anecdotal support. *See Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 158 (2d Cir. 2001), *abrogated on other grounds by Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Doheny relies on such a combination. As noted, according to the Complaint, Kyndryl "recently laid off hundreds of employees, . . . app[arently] . . . includ[ing] a disproportionately high number of employees over the age of [40]." Compl. ¶ 18. "Of 420 US workers tapped by Kyndryl for [possible layoff], 156 people . . . between the ages of 25 and 70 lost their jobs, at an average age of 55." Claburn, *supra.* Meanwhile, the average age of employees in Kyndryl's mainframe group is 35, and the median age for U.S. workers in the "data processing, hosting, and related services" and "computer systems design and related services" sectors is 37.0 and 40.8 respectively. *Id*. (quoting U.S. Bureau of Lab. Stat., *supra*). Although these statistics may not be

sufficient on their own to state a plausible claim, they are nonetheless compelling. *Cf. Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69–70 (2d Cir. 2015) (explaining why certain statistics alone were not enough to state a plausible class claim for employment discrimination under 42 U.S.C. § 1981 or the Equal Protection Clause); *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (describing how courts assess statistical significance where plaintiffs seek to establish a *prima facie* case of discrimination under Title VII). They are more than "raw" fractions; rather, they "provid[e] . . . detail as to the number of individuals" selected for layoff and ultimately terminated, as well as comparative data suggesting laid-off workers were older than others in plausibly comparable positions. *Burgis*, 798 F.3d at 70; *see also Richardson v. City of New York*, No. 17-CV-9447, 2018 WL 4682224, at *7 (S.D.N.Y. Sept. 28, 2018) (finding statistics compelling, in the § 1981 context, where the plaintiffs provided more than raw percentages or numbers).[9]

The two specific instances of discrimination resulting from Kyndryl's alleged practice of targeting older employees for layoff—Doheny's and DeGruccio's layoffs—supplement the statistical evidence, "br[inging] the cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339. As discussed above, the alleged circumstances surrounding Doheny's layoff render it plausible that she would not have been laid off but for her age. The same applies to DeGruccio. Kyndryl laid off 60-year old DeGruccio despite his purported productivity, *see* Compl. ¶¶ 5, 26, while maintaining a "practice[] of targeting," *id.* ¶ 33, those aged 40 and older for layoff. Although the two instances of discriminatory layoffs alone are also not enough to state a plausible collective

---

[9] To be sure, the incorporated statistics have their own shortcomings. The average age of workers in Kyndryl's mainframe group is not necessarily the average age of Kyndryl's U.S. workforce. *See supra* note 3. Nevertheless, the statistics on the average age of Kyndryl's mainframe group workers and the median ages of U.S. workers in relevant sectors are, at this early stage, sufficient comparators to help provide the "minimal inference," *Littlejohn*, 795 F.3d at 311, that "[intentional age] discrimination was the company's standard operating procedure," *Teamsters*, 431 U.S. at 336.

claim, *see Ste. Marie*, 650 F.2d at 406; *Barrett*, 39 F. Supp. 3d at 430, they, together with the reported statistics, "nudge[] the[] claim[] across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

This claim, however, is plausible only to the extent it is based on Kyndryl's alleged practice of targeting older employees for layoff. To the extent it is based on Kyndryl's alleged practice "of preventing [older] employees from consideration for . . . open internal Kyndryl positions for which they are qualified," Doheny fails to state a plausible claim. Compl. ¶ 33. As discussed above, the relevant statistic undercuts her allegation: The average age of workers tapped for possible layoff but ultimately transferred was 52. *See* Claburn, *supra*. The Complaint also does not reference "more than two" specific instances of discrimination with respect to Kyndryl's transfer practice. *Ste. Marie*, 650 F.2d at 406. Thus, as to Kyndryl's transfer practice, the allegations are insufficient to plausibly support a "minimal inference," *Littlejohn*, 795 F.3d at 311, that intentional age discrimination was Kyndryl's "standard operating procedure," *Teamsters*, 431 U.S. at 336.

To summarize, Doheny's collective age discrimination claim survives as to Kyndryl's alleged practice of targeting older employees for layoff, but not as to its alleged practice of preventing older employees from transferring positions. If, however, the Court ultimately either denies Doheny's pending motion to conditionally certify the collective action or grants a future decertification motion, the collective claim will be dismissed. *See Chin*, 685 F.3d at 150 (holding that pattern-or-practice claims are not available to individual plaintiffs).

## B.  Doheny's Age Discrimination Claim: Disparate Impact

The Court next considers whether Doheny states a plausible claim for age discrimination under the ADEA, 29 U.S.C. § 623(a)(2), based on a disparate-impact theory of liability.

The ADEA prohibits an employer from "limit[ing], segregat[ing], or classify[ing] [its] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). It thus gives rise to disparate-impact claims, which plaintiffs can bring individually or as a collective action. *See, e.g.*, *Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2d Cir. 1992); *Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 541 (S.D.N.Y. 2016). "Like pattern-or-practice disparate treatment claims, disparate impact claims 'are attacks on the systemic results of employment practices.'" *Robinson*, 267 F.3d at 160 (quoting *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984)). Unlike disparate-treatment claims, though, disparate-impact claims do not require proof of discriminatory intent. *See Teamsters*, 431 U.S. at 335 n.15. Instead, disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Smith*, 544 U.S. at 239 (quoting *Teamsters*, 431 U.S. at 335 n.15). The "premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988).

For a disparate-impact claim to survive a Rule 12(b)(6) motion, a plaintiff "need not plead a *prima facie* case," but instead need only "set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim." *Mandala v. NTT Data, Inc*., 975 F.3d 202, 209 (2d Cir. 2020). Accordingly, the plaintiff must provide factual allegations that plausibly "(1) identify a specific[,] [neutral] employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Id.* at 207 (quoting *Chin*, 685 F.3d at 151); *see also Maresco*, 964 F.2d at 115 (describing the elements of a disparate-impact ADEA

claim as the "identif[ication of] a specific employment practice having an adverse impact upon members of the protected class" and a "show[ing] [of] causation").

To identify a specific, neutral employment policy, a plaintiff must identify the "criteria," *Watson*, 487 U.S. at 988, "specific test, requirement, or practice within [the policy] that has an adverse impact on older workers," *Smith*, 544 U.S. at 241; *see also Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C. Cir. 2019) ("[W]here the object of the suit is an identifiable practice, criterion, or bundle of criteria behind a specified employment event like [a] rash of contemporaneous layoffs . . . , disparate impact analysis applies."). Merely identifying a "generalized policy," *Smith*, 544 U.S. at 241, or an "imbalance in the work force," *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e–2(k), does not suffice.

Moreover, although disparate-treatment claims based on an employer's pattern or practice may, at times, "converge[]" with disparate-impact claims, this is often not the case. *Segar*, 738 F.2d at 1267. "Actions predicated on either theory involve attacks on the systemic results of employment practices." *Id*. at 1298 (Edwards, J., concurring).  Yet the focus of the claims differs: While "plaintiffs in a pattern and practice suit . . . focus on the intentional discrimination that is demonstrated by the operation of the system in its *entirety*," plaintiffs in a disparate-impact suit "make claims that *particular* components in the system have a disparate impact." *Id*. (emphases added). The requirement that plaintiffs must plausibly identify a specific, neutral employment policy is a key distinction. Without it, employers could face "liab[ility] for 'the myriad of innocent causes that may lead to statistical imbalances.'" *Smith*, 544 U.S. at 241 (quoting *Wards Cove Packing Co.*, 490 U.S. at 657).

Doheny fails to set forth sufficient factual allegations to plausibly identify "a specific[,] [neutral] employment practice or policy." *Mandala*, 975 F.3d at 207 (quoting *Chin*, 685 F.3d at 151). Beyond asserting that Kyndryl "target[ed]" older employees for layoff—a purported practice that sounds in intentional discrimination and, thus, in disparate treatment—Doheny merely alleges that Kyndryl "disproportionately end[ed] the employment of employees" aged 40 and older. Compl. ¶ 33. Even if (1) "disproportionately ending the employment" of older employees or (2) "preventing those employees from consideration for other open internal Kyndryl positions for which they are qualified," *id.*, are arguably neutral policies, they are not "specific," *Mandala*, 975 F.3d at 207 (quoting *Chin*, 685 F.3d at 151), ones. Doheny identifies no "criteria," *Watson*, 487 U.S. at 988, "specific test, requirement, or practice within [the policies] that has an adverse impact on older workers," *Smith*, 544 U.S. at 241. As to the alleged layoff policy, Doheny does not allege, for example, that Kyndryl disproportionately ended the employment of older workers by "'targeting' demographically disproportionate departments for layoffs." *Davis*, 925 F.3d at 1250 (quoting *Shollenbarger v. Planes Moving & Storage*, 297 Fed. App'x 483, 486 (6th Cir. 2008)). Nor does she allege, with respect to the purported transfer policy, that Kyndryl prevented older employees from transferring by "limit[ing] public notice" of job openings. *See Barnes v. Saul*, 840 F. App'x 943, 946 (9th Cir. 2020). At worst, Doheny does no more than identify aged-based "imbalance[s] in the work force." *Wards Cove Packing Co*., 490 U.S. at 657. And because Doheny fails with respect to the first element of a plausible disparate-impact claim, the Court need not consider whether she succeeds as to the disparity or causation elements of one.

In short, Doheny fails to state a plausible claim for age discrimination under the ADEA, 29 U.S.C. § 623(a)(2), based on a disparate-impact theory of liability.

### C.  Doheny's Retaliation Claim

Doheny also brings an individual claim for retaliation under the ADEA pursuant to 29 U.S.C. § 623(d).

The ADEA prohibits retaliation by rendering it "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by [§ 623], or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). "[F]or a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against [her]" (2) because she opposed an employment practice unlawful under the ADEA or participated in an investigation, proceeding, or litigation under it. *Vega*, 801 F.3d at 90; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006) (applying the standard for Title VII retaliation claims to ADEA claims). As noted, termination is an example of an adverse employment action. *See, e.g.*, *Schiano*, 445 F.3d at 609. "As for causation, a plaintiff must plausibly plead a connection between the [adverse] act and [her] engagement in protected activity," *Vega*, 801 F.3d at 90–91, such that "that the adverse action would not have occurred in the absence of the retaliatory motive," *Lively*, 6 F.4th at 307 (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). A plaintiff can do so (1) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant" or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Littlejohn*, 795 F.3d at 319. Indirect causation requires the employer to have known that

18

the employee engaged in protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011).

Doheny satisfies only the first element of a plausible retaliation claim. She plausibly alleges that Kyndryl took adverse employment action against her by laying her off, *see Schiano*, 445 F.3d at 609, but she fails to plausibly allege causation. Doheny does assert that Kyndryl selected her for layoff because she had pursued a claim of discrimination against IBM and that Kyndryl laid her off the day after she resolved that claim.[10] Compl. ¶ 22. She does not, however, allege facts supporting the notion that Kyndryl even knew of the claim, when the claim was resolved, or whether it was resolved at all—let alone that she was fired because of it. *See Khaleel v. Metro One Loss Prevention Servs. Groups*, 469 F. Supp. 2d 130, 134 (S.D.N.Y. 2007) (dismissing a Title VII claim because plaintiff did not plausibly allege that his employer was aware of his discrimination claim).

Doheny's claim for retaliation under the ADEA, 29 U.S.C. § 623(d), is thus dismissed.

### D.  DeGruccio's Age Discrimination Claims

The Court turns next to DeGruccio's claims against Kyndryl for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941. It first considers whether the claims survive as individual ones and then whether they survive as collective or class ones, respectively. Kyndryl argues that DeGruccio agreed to arbitrate any individual claims and to waive any collective or class ones. The Court agrees and dismisses his claims.[11] Moreover, because

---

[10] The Court can reasonably infer from the alleged facts that her discrimination claim against IBM was an age discrimination claim. *See Iqbal*, 556 U.S. at 678.

[11] Kyndryl does not explicitly or implicitly ask the Court to compel arbitration and instead moves only to dismiss DeGruccio's claims under Rule 12(b)(6) based in part on the arbitration provision. Accordingly, the Court does not construe its motion to dismiss as a motion to compel arbitration. *See Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016).

the opt-in plaintiffs agreed to refrain from opting into any collective claim, the collective claim for

age discrimination under the ADEA, 29 U.S.C. § 623(a), is dismissed as to them as well.

### 1. DeGruccio's Individual Claims

Generally, where an employee signs a valid contract containing a release of discrimination

claims, courts must enforce the contract according to its terms. *See Mangini v. McClurg*, 249

N.E.2d 386, 389–90 (N.Y. 1969); *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir.

1998). The same principle applies in the specific context of ADEA claims, although the waiver of

rights under the ADEA must satisfy additional requirements set forth in 29 U.S.C. § 626(f). *See*

*EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1535 (2d Cir. 1996). Among other things, "if a

waiver is requested in connection with an exit incentive or other employment termination program

offered to a group or class of employees, the employer" must "inform[] the individual in writing

. . . as to . . . the job titles and ages of all individuals eligible or selected for the program, and the

ages of all individuals in the same job classification or organizational unit who are not eligible or

selected for the program." 29 U.S.C. § 626(f)(1)(H)(ii).

The Agreement signed by DeGruccio contains a release of discrimination claims, including

ADEA claims. Section 2 of the Agreement provides:

> By signing this Agreement, you *release Kyndryl from ALL claims* that you may
> have against it at the time of signing, . . . including, without limitation, and to the

---

"'[I]t is unsettled,' in this Circuit, whether 'the correct procedural vehicle' for moving to dismiss a complaint based on the existence of a binding arbitration agreement is Rule 12(b)(1) or Rule 12(b)(6)." *Dylan 140 LLC v. Figueroa*, No. 19-CV-2897, 2019 WL 12339639, at \*4 (S.D.N.Y. Nov. 8, 2019), *aff'd* 982 F.3d 851 (2d Cir. 2020) (alteration in original) (quoting *Fed. Ins. Co. v. Metro. Transp. Auth.*, No. 17-CV-3425, 2018 WL 5298387, at \*3 (S.D.N.Y. Oct. 25, 2018)). "Some courts in this District have held that the existence of an arbitration agreement requiring the plaintiff to submit her claims to arbitration deprives the Court of subject matter jurisdiction," requiring dismissal under Rule 12(b)(1). *Jordan-Rowell v. Fairway Supermarket*, No. 18-CV-1938, 2019 WL 570709, at \*7 (S.D.N.Y. Jan. 16, 2019), *report and recommendation adopted*, 2019 WL 568966 (S.D.N.Y. Feb. 12, 2019); *see id.* (collecting cases). "Other courts have analyzed motions to dismiss in favor of arbitration under Rule 12(b)(6), for failure to state a claim upon which relief can be granted." *Dylan 140 LLC*, 2019 WL 12339639, at \*4. The Court applies Rule 12(b)(6) here because Kyndryl brings its motion to dismiss under Rule 12(b)(6) and "no party objects to the application of Rule 12(b)(6)." *Veliz v. Collins Bldg. Servs., Inc.*, No. 10-CV-06615, 2011 WL 4444498, at \*3 (S.D.N.Y. Sept. 26, 2011). "[I]n any event, the result here would be the same under" either rule. *Id.*

maximum extent permitted by law: any and all claims *arising under* any federal, state, local, or foreign law dealing with or regulating employment, including, but not limited to: (1) *laws prohibiting discrimination or harassment based on . . . age . . .* [and] (3) *claims arising under . . . Age Discrimination in Employment Act of 1967 (ADEA)*.

Burkhardt Decl., Ex. 1 § 2 (emphases added). The Agreement also contains an arbitration provision, Section 6, which states:

> You agree that *any and all legal claims* or disputes between you and Kyndryl that *have not [been] or cannot be released* by private agreement as a matter of law . . . will be resolved on an individual basis by private, confidential, final and *binding arbitration.*

*Id*. Ex. 1 § 6 (emphases added). DeGruccio argues that the release in Section 2 is invalid as to his ADEA claim because Kyndryl failed to disclose a list of the ages of the employees it retained. The Court, however, need not decide whether the release is valid given that Section 6 of the Agreement validly requires him to arbitrate any unreleased claims.

"In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Arbitration agreements must be "'rigorously enforce[d]' . . . according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221 (1985)).

### a. Validity of the Agreement and Arbitration Provision

State contract law—here, New York's—dictates whether the parties entered into a valid agreement to arbitrate. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012).[12] "To

---

[12] The Agreement contains a forum selection clause, Section 6, which provides: "This agreement to arbitrate claims shall be governed by and interpreted in accordance with the Federal Arbitration Act ('FAA'). If for any reason the FAA is held inapplicable to this Agreement, then the State of New York's law of arbitrability shall apply." Burkhardt Decl., Ex. 1 § 6. "[W]hile . . . the FAA preempts state law that treats arbitration agreements differently from any other contracts, it also 'preserves general principles of state contract law as rules of decision on

form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (quoting *Louros v. Cyr*, 175 F. Supp. 2d 497, 512 (S.D.N.Y. 2001)).

All of these elements are present with regard to the arbitration provision and the Agreement more broadly. Through the Agreement, Kyndryl "offered [DeGruccio] payments and benefits as part of a workforce rebalancing action that [he] otherwise would not have been entitled to receive." Burkhardt Decl., Ex. 1 at 18. DeGruccio "clear[ly], unambiguous[ly] and unequivocal[ly]" accepted Kyndryl's offer, as evidenced by his signature. *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (quoting *King v. King*, 617 N.Y.S.2d 593, 594 (N.Y. App. Div. 1994)). He also "agree[d] that the payments and benefits [he received] or [would] receive under th[e] Agreement [were] good and valuable consideration for entering into" it. Burkhardt Decl., Ex. 1 § 8. DeGruccio's signature and the terms of the Agreement provided by Kyndryl, moreover, demonstrate a "sufficiently definite," *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019), "mutual assent and intent to be bound," *Register.com, Inc.*, 356 F.3d at 427.

DeGruccio nonetheless contends that the arbitration provision's confidentiality clause renders the entire Agreement, including its arbitration provision, invalid under *McLaren Macomb*, 372 N.L.R.B. No. 58 (2023). In *McLaren Macomb*, the National Labor Relations Board ("NLRB") held that an employer violated the National Labor Relations Act ("NLRA") by offering employees a separation agreement containing "overly broad" non-disparagement and confidentiality clauses. *Id*. at *8; *see id.* at *1. It reasoned that the employer violated the NLRA because proffering such

---

whether the parties have entered into an agreement to arbitrate.'" *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co*., 189 F.3d 289, 295–96 (2d Cir. 1999) (quoting *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir.1993)). Thus, New York law determines whether the parties entered into a valid agreement to arbitrate.

an agreement had had a "reasonable tendency to interfere with, restrain, or coerce" the prospective exercise of employees' rights under Section 7 of the NLRA. *Id.* at *10.

Regardless of the deference owed to the NLRB, *see Pattern Makers' League of N. Am. v. NLRB*, 473 U.S. 95, 100 (1985), *McLaren Macomb* does not render Kyndryl's Agreement invalid. First, the non-disparagement and confidentiality clauses in McLaren Macomb's separation agreement are distinguishable from Kyndryl's confidentiality clause. The former "broadly prohibited [employees] from making statements that could disparage or harm the image of the [employer] and further prohibited them from disclosing the terms of the [severance] agreement." *McLaren Macomb*, 372 N.L.R.B. No. 58, at *1. The confidentiality provision in Kyndryl's Agreement, by contrast, is far narrower in scope. It applies only to arbitration and not the Agreement as a whole. *See* Burkhardt Decl., Ex. 1 at 25. Additionally, it does not broadly prohibit disparaging statements. Instead, it only requires parties to "maintain the confidential nature of the arbitration proceeding and the award" and avoid disclosing "information related to the proceeding," with several exceptions. *Id.*

Second, even if Kyndryl's confidentiality provision violated the NLRA, the proper remedy would simply be to sever the clause from the Agreement, rather than to deem the entire Agreement invalid. The Agreement contains a severability clause dictating that "[i]f any part of [it] is held to be invalid or unenforceable, the remaining provisions of this Agreement [would] not be affected in any way." *Id.* § 7. Both case law and the NLRB favor severing a violative contractual provision. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 124 (2d Cir. 2010); Nat'l Lab. Rels. Bd., GC 23-05, Guidance in Response to Inquiries About the *McLaren Macomb* Decision 3–4 (2023).

Accordingly, the Agreement is a valid contract containing a valid arbitration provision.

### b. Scope of the Arbitration Provision

The "scope" of that valid arbitration provision is straightforward. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128 (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)). It covers "*any and all* legal claims or disputes . . . that have not [been] or cannot be released." Burkhardt Decl., Ex. 1 § 6 (emphasis added). Thus, to the extent they are not released, DeGruccio's individual claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, are subject to arbitration. Therefore, they are dismissed.

### 2. DeGruccio's Collective and Class Claims

The question remains as to whether DeGruccio's claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, can proceed respectively as collective and class claims. Courts have repeatedly upheld the validity of class and collective action waivers, including under the FAA and ADEA. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *Estle v. Int'l Bus. Machs. Corp.*, 23 F.4th 210, 212–14 (2d Cir. 2022); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 292 (2d Cir. 2013) (per curiam). The Agreement contains such a waiver. Section 6 of the Agreement provides:

> To the maximum extent permitted by applicable law, you and Kyndryl agree that *no Covered Claims may be initiated*, maintained, heard, or determined *on a multiparty, class action basis or collective action basis either in court or arbitration*, and that you are not entitled to serve or participate as a class action member or representative, or collective action member or representative . . . .

> You further agree that if you are included within any class action or collective action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.

Burkhardt Decl., Ex. 1 § 6 (emphases added). DeGruccio offers no reason as to why this waiver is invalid, apart from his argument that the Agreement as a whole is invalid—a contention the Court has already deemed unpersuasive. The Court concludes that no such reason exists.

Accordingly, given the waiver, DeGruccio's collective and class age discrimination claims are dismissed.

### E.  Opt-In Plaintiffs' Claims

The Court further dismisses the collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), as it pertains to the four opt-in plaintiffs: Laurence Healy, Abram Mercedes, Margaret Allen, and Maura Wasson. Like DeGruccio, the opt-in plaintiffs signed the Agreement, through which they waived any collective claims and committed to "refrain[ing] from opting in[to]" a collective action. *E.g.*, Burkhardt Decl., Ex. 2 § 6; *see id.* Exs. 3–5; *see also Rusis,* 529 F. Supp. 3d at 196–97 & n.9 (precluding opt-in plaintiffs who waived their right to participate in collective actions from seeking relief under the ADEA); *Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780, 2021 WL 7906503, at *8–9 (E.D.N.Y. Jan. 6, 2021) (recommending the dismissal of opt-in plaintiffs who released claims).

## II.    Claims Against IBM

The Court turns now to the ADEA, 29 U.S.C. § 623(a), (d), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, claims against IBM. Kyndryl terminated Plaintiffs about a year and half after it spun off from IBM in 2021. *See* Compl. ¶¶ 2, 4–5. Nonetheless, Plaintiffs allege that IBM is liable for the same violations of the ADEA and FEHA as Kyndryl is—even though IBM and Kyndryl, as IBM observes, are "completely separate and independent" publicly-traded and regulated corporations. IBM's Mem. at 1, Dkt. No. 35.

25

Plaintiffs' age discrimination claims against IBM rely on three theories of liability: (1) that Kyndryl is IBM's "alter ego"; (2) that Kyndryl and IBM were a "single employer"; and (3) that Kyndryl and IBM were a "joint employer."[13] Doheny's retaliation claim, meanwhile, relies on the theory that IBM, as her former employer, interfered with her employment at Kyndryl. The Court addresses each theory in turn, concluding that none of the claims survives IBM's motion to dismiss. Furthermore, because Plaintiffs' collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), is dismissed, there remains no basis upon which the unnamed plaintiffs may opt into the suit against IBM. *Cf. Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 230 (S.D.N.Y. 2003) (explaining that although a plaintiff may bring a collective action on behalf of other employees "similarly situated," a plaintiff without a claim is not "similarly situated" to an employee who may have one (quoting 29 U.S.C. § 216(b))).

### A.   "Alter Ego" Theory

Corporate entities are generally not liable for the acts of other corporate entities. *See Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). Where one corporate entity serves as the "alter ego" of another, however, courts may pierce the corporate veil to impose liability on the corporate entity that would generally not be liable. *See, e.g.*, *Kertesz v. Korn*, 698 F.3d 89, 91 (2d Cir. 2012) (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)). In some circumstances, courts may pierce the corporate veil where a parent-subsidiary, sister, or successor-employer relationship exists. *See, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995);

---

[13] Plaintiffs contend that whether an "alter ego," "joint employer," or "single employer" relationship exists is a question of fact that cannot be resolved on a motion to dismiss. In some cases, this may be true. *See, e.g.*, *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). But a plaintiff cannot circumvent pleading requirements merely by asserting such theories of liability. The plaintiff must still allege facts making the claim plausible under such theories of liability. *See, e.g.*, *Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 373–74 (S.D.N.Y. 2022), *aff'd*, No. 22-2917-CV, 2023 WL 7272062 (2d Cir. Nov. 3, 2023); *Stinson v. City Univ. of N.Y.*, No. 17-CV-3949, 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018).

*Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 746, 748–49 (2d Cir. 1996), *as amended* (May 9, 1996) (per curiam); *Main Bank of Chi. v. Baker*, 427 N.E.2d 94, 101–02 (Ill. 1981). But the "exceptional circumstances" necessary to pierce the corporate veil are "rare." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). They are certainly not present here.

### 1.  Choice of Law

Plaintiffs do not allege that IBM and Kyndryl share a parent-subsidiary, sister, or successor-employer relationship. Nonetheless, assuming the "alter ego" theory of liability would even apply absent such a relationship, the Court's initial task is to determine which body of substantive law applies. The analysis differs somewhat between Plaintiffs' ADEA and FEHA claims.

### a.  ADEA Age Discrimination Claim

The Court has subject matter jurisdiction over Plaintiffs' action because ADEA claims raise a federal question. *See* 28 U.S.C. § 1331. "Where," as here, "jurisdiction is based on the existence of a federal question . . . [courts] have not hesitated to apply a federal common law choice of law analysis." *Barkanic v. Gen. Admin. of Civ. Aviation of China*, 923 F.2d 957, 961 (2d Cir. 1991). "The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *In re: Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992). "The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy[] and determine which jurisdiction's laws and policies are implicated to the greatest extent." *Id*. "[W]hen conducting a federal common law choice-of-law analysis, absent guidance from Congress, [courts] may consult the Restatement (Second) of Conflict of Laws." *Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007).

The state of incorporation has the greatest interest in determining when liability protections no longer apply because corporations receive their liability protections through state law. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *see also Cort v. Ash*, 422 U.S. 66, 84 (1975) (observing that "corporations are creatures of state law"). This principle accords with the Restatement's directive that "[t]he local law of the state of incorporation" should generally be applied to determine liability. Restatement (Second) of Conflict of Laws §§ 302(2), 306–07, 309 (Am. L. Inst. 1971). Delaware is Kyndryl's state of incorporation.[14] Thus, there exists good reason to apply Delaware law to the question of whether Plaintiffs state a plausible claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), based on an "alter ego" theory of liability.

Yet there is also an argument that substantive federal common law applies to this question. Some "courts have held that federal common law governs alter-ego theories 'when a federal interest is implicated by the decision of whether to pierce the corporate veil.'" *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 275 n.11 (2d Cir. 2023) (quoting *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 848 (6th Cir. 2017)). The federal interest in "national uniformity in the regulation of labor relations" may well be implicated here. *Monarch Long Beach Corp. v. Soft Drink Workers, Loc. 812*, 762 F.2d 228, 231 (2d Cir. 1985). "Federal courts have fashioned a body of federal common law to govern labor disputes, recognizing that harmonious labor relations are essential to interstate commerce." *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co*, 210 F.3d 18, 26 (1st Cir. 2000).

---

[14] Plaintiffs allege that New York is Kyndryl's state of incorporation. *See* Compl. ¶ 7. But the Court takes judicial notice of the fact that Kyndryl's state of incorporation, as stated in a Securities and Exchange Commission ("SEC") filing, is Delaware. *See* Kyndryl Holdings, Inc., Registration Statement (Form S-8) (July 29, 2022); *see also Mira v. Kingston*, 218 F. Supp. 3d 229, 235 n.3 (S.D.N.Y. 2016), *aff'd*, 715 F. App'x 28 (2d Cir. 2017) (taking judicial notice of a state of incorporation through an SEC filing); *Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 143 (S.D.N.Y. 2023) (explaining that a court may disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts" (quoting *Becker* v. *Cephalon, Inc.*, No. 14-CV-3864, 2015 WL 5472311, at *5 (S.D.N.Y. Sept. 15, 2015))).

Accordingly, either Delaware law or the federal common law applies to Plaintiffs' claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), based on "alter-ego" liability.

### b. FEHA Age Discrimination Claim

The choice-of-law analysis differs as to Plaintiffs' claim for age discrimination under the FEHA, Cal. Gov't Code §§ 12940(a), §12941, because it is a state-law claim.

The Court may exercise supplemental jurisdiction over Plaintiffs' FEHA claim. *See* 28 U.S.C. § 1367. "A federal court . . . adjudicating state law claims that are [supplemental] to a federal claim must apply the choice of law rules of the forum state," which, here, is New York. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). Under New York's choice-of-law rules, "the first step . . . is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). An "actual conflict" exists where "the applicable law from each jurisdiction provides different substantive rules," *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998), and the differences "have a 'significant possible effect on the outcome of the trial,'" *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (quoting *Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 71 (2002)). Where a conflict exists, "[t]he law of the state of incorporation determines when the corporate form will be disregarded." *Kalb, Voorhis & Co.*, 8 F.3d at 132; *see SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280, 2013 WL 5366373, at *4 (S.D.N.Y. Sept. 25, 2013); *In re Optimal U.S. Litig.*, No. 10-CV-4095, 2011 WL 4908745, at *2 (S.D.N.Y. Oct. 14, 2011). Where no conflict exists, New York law applies. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422–23 (2d Cir. 2006).

The laws of New York, Delaware, and California all factor into the conflict analysis here. *See, e.g.*, *Hernandez v. Off. of the Comm'r of Baseball*, No. 18-CV-9035, 2019 WL 3034841, at

*3 (S.D.N.Y. July 11, 2019) (explaining that to determine a jurisdiction's interest in a discrimination case, courts consider the jurisdiction's relationship to or contact with the parties and alleged acts, including the plaintiff's residency, the defendant's principal place of business, and the location of the acts). Kyndryl has its principal place of business in New York and is a Delaware corporation. Compl. ¶ 8; *see supra* note 14. DeGruccio, meanwhile, was a California employee and resides there. Compl. ¶ 5.

Courts in this District have concluded that no conflict exists between New York and Delaware's "alter ego" liability law, and at least one court has determined that no conflict exists between California and Delaware law. *See Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 430 & n.16 (S.D.N.Y. 2010) (collecting cases); *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, No. 18-CV-5831, 2020 WL 6690659, at *7 (S.D.N.Y. Nov. 13, 2020). This congruence counsels in favor of applying New York law to DeGruccio's FEHA claim. *See Wall*, 471 F.3d at 422–23. But to the extent any conflict exists, the Court would apply the law of Delaware—Kyndryl's state of incorporation—which it has already concluded is appropriate in assessing Plaintiffs' ADEA claim. *See Kalb, Voorhis & Co.*, 8 F.3d at 132.

In sum, the Court will assess whether Plaintiffs state a plausible claim for age discrimination based on "alter ego" liability under Delaware law, New York law, and the federal common law.

### 2. Application of Delaware, New York, and Federal Common Law

Whether the Court applies Delaware law, New York law, or the federal common law, Plaintiffs plainly fail to state a plausible claim for age discrimination under either the ADEA, 29 U.S.C. § 623(a), or FEHA, Cal. Gov't Code §§ 12940(a), 12941, pursuant to an "alter ego" theory of liability.

"To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" *Fletcher*, 68 F.3d at 1457 (alteration in original) (quoting *Harper v. Delaware Valley Broads., Inc*., 743 F. Supp. 1076, 1085 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991)). Among the factors indicative of whether two corporations operate as a "single economic entity" are

> [w]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id*. (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.,* No. CIV. A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). Plaintiffs allege neither that Kyndryl and IBM "operated as a single economic entity" nor any facts relevant to these factors. *Id.* (quoting *Harper*, 743 F. Supp. at 1085). They also fail to plausibly allege that an "overall element of injustice or unfairness . . . [is] present." *Id.* (quoting *Harper*, 743 F. Supp. at 1085). Accordingly, Plaintiffs fail to state a plausible claim for age discrimination under Delaware's conception of "alter ego" liability.

To pierce the corporate veil under New York law, a plaintiff must show that (1) "the [controlling entity] exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co*., 122 F.3d 130, 134 (2d Cir. 1997)). Courts have considered the following factors to determine whether to pierce the corporate veil:

(1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) [intermingling of] funds . . . , (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at arm[']s length, (8) whether the corporation is treated as . . . independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own.

*Am. Fuel Corp.*, 122 F.3d at 134; *see MAG Portfolio Consult, GMBH*, 268 F.3d at 63.

Plaintiffs allege no facts revealing of Factors 1 through 5 and 7 through 10. Arguably as to Factor 6, Plaintiffs allege that "it is clear that IBM has been involved in, and is behind, Kyndryl's continuation of IBM's discriminatory layoffs." Compl. ¶ 19. In support of this allegation, they observe that both IBM and Kyndryl term their layoffs "Resource Actions" and that the severance package Kyndryl offers to laid-off employees "appears to be based on" those offered to IBM employees. *Id.* It is unremarkable, however, that a relatively new spin-off entity would rely on familiar language and documents even while exercising its own "business discretion." *Am. Fuel Corp.*, 122 F.3d at 134. In other words, shared terminology or similar severance packages alone are insufficient to plausibly suggest that IBM "complete[ly] dominat[ed]" Kyndryl. *MAG Portfolio Consult, GMBH*, 268 F.3d at 63 (quoting *Am. Fuel Corp.*, 122 F.3d at 134). The same conclusion applies to Kyndryl's provision of resources on IBM URLs. *See* Compl. ¶ 19. Plaintiffs thus also fail to state a plausible claim for age discrimination under New York law's interpretation of "alter ego" liability.

Finally, to pierce the corporate veil under the federal common law, a plaintiff must show that the controlling corporation "perpetrate[d] a fraud or . . . so dominated and disregarded the corporate entity's form that the entity primarily transacted the [dominated entity's] personal business rather than its own corporate business." *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782

F.2d 329, 342 (2d Cir. 1986) (quoting *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 594 F. Supp. 1490, 1498 (S.D.N.Y.), *amended*, 609 F. Supp. 451 (S.D.N.Y. 1984)). There is no allegation of fraud here. As to domination, courts have applied the same factors to determine whether an "alter ego" relationship exists under the federal common law as they do under New York law. *See, e.g.*, *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509–10 (S.D.N.Y. 2012); *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, No. 12-CV-5754, 2013 WL 1274561, at *8 (S.D.N.Y. Mar. 29, 2013), *aff'd sub nom. NYKCool A.B. v. Ecuadorian Line, Inc.*, 562 F. App'x 45 (2d Cir. 2014); *D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd.*, 348 F. Supp. 3d 365, 391 (S.D.N.Y. 2018), *aff'd sub nom. D'Amico Dry d.a.c. v. Sonic Fin. Inc.*, 794 F. App'x 127 (2d Cir. 2020). As discussed above, Plaintiffs fail to state a plausible claim for age discrimination under these factors.

Their claim fails even when accounting for equity concerns, which courts applying the federal common law consider in addition to the factors above. *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008). The federal common law tends to "give[] less deference to the corporate form than does the strict alter ego doctrine of state law." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (emphasis omitted). "Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil 'has been that liability is imposed when doing so would achieve an equitable result.'" *Williamson*, 542 F.3d at 53 (quoting *William Wrigley Jr. Co.*, 890 F.2d at 601). This general guiding principle is consistent with the remedial purpose of the ADEA. *See Hyland v. New Haven Radiology Assocs., P.C.*, 794 F.2d 793, 796 (2d Cir. 1986), *abrogated on other grounds by Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440 (2003) (describing the ADEA as "remedial in nature"). Still, the Court discerns no facts rendering it plausible that "alter ego" liability is necessary to achieve

an equitable result here. *See Williamson*, 542 F.3d at 53. Plaintiffs thus fail to state a plausible claim for age discrimination under the federal common law's conception of "alter ego" liability.

Accordingly, Plaintiffs' claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, are dismissed to the extent they rely on an "alter ego" theory of liability.

### B. "Single Employer" Theory

The Court next considers whether Plaintiffs state a plausible ADEA, 29 U.S.C. § 623(a), or FEHA, Cal. Gov't Code §§ 12940(a), 12941, claim based on the theory that Kyndryl and IBM were a "single employer."

In their briefing, both Plaintiffs and IBM rely on the Second Circuit's law on what constitutes a "single employer" relationship in an employment discrimination context. DeGruccio does not suggest that a different interpretation of the "single employer" relationship applies to the FEHA. Accordingly, both Plaintiffs and IBM "implied[ly] consent" to the application of the Second Circuit's law on "single employer" relationships to both their ADEA and FEHA claims. *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989).

The "single employer" theory of liability "allow[s] a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir.), *certified question accepted*, 60 N.E.3d 420 (N.Y. 2016), *and certified question answered*, 76 N.E.3d 1063 (N.Y. 2017) (quoting *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010)). "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise.'" *Id.* (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d

Cir. 1985)). Under the "single employer doctrine," "an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity, may impose liability . . . on another entity comprising part of the single integrated employer." *Id.* (quoting *Fowler v. Scores Holding Co.*, 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009)).

Courts generally rely on four considerations "[t]o determine whether two separate entities should be considered a single employer for the purposes of employment discrimination claims": "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Id.* (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *see Dewey v. PTT Telecom Netherlands, U.S., Inc.*, 101 F.3d 1392 (2d Cir. 1996) (unpublished table decision) (applying the four factors in the context of an ADEA claim).

Regarding the "interrelation of operations," courts generally consider factors such as

(1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) whether the two entities shared employees, services, records and equipment; (3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines; (4) whether the parent maintained the subsidiary's books; (5) whether the parent issued the subsidiary's paychecks; and (6) whether the parent prepared and filed the subsidiary's tax returns.

*Juhua Han v. Kuni's Corp.*, No. 19-CV-6265, 2020 WL 2614726, at *9 (S.D.N.Y. May 22, 2020) (quoting *Schade v. Coty, Inc.*, No. 00-CV-1568, 2001 WL 709258, at *7 (S.D.N.Y. June 25, 2001)). Plaintiffs do not allege any facts applicable to these factors.

As for the most important factor—the "centralized control of labor relations"—courts generally consider factors such as

whether the subsidiary has a separate human resource department[;] whether the [controlled entity] establishes its own policies and makes it[s] own decisions as to the hiring, discipline, and termination of its employees[;] whether employment applications are sent to the [controlling entity] [;] whether the [controlled entity]

35

> must clear all major employment decisions with the [controlling entity] [;] and whether the [controlling entity] routinely shifts employees between the two companies.

*Juhua Han*, 2020 WL 2614726, at \*9 (quoting *Schade*, 2001 WL 709258, at \*8); *see also Griffin*, 835 F.3d at 292 ("[C]ontrol of labor relations is the central concern." (quoting *Murray*, 74 F.3d at 404)). Ultimately, though, the key "question is '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Brown*, 756 F.3d at 227 (quoting *Cook*, 69 F.3d at 1240).

Plaintiffs do not allege that IBM made the final decision regarding their layoffs or any transfer inquires. Indeed, their allegations do not even plausibly suggest that IBM was aware of Plaintiffs' layoffs. Virtually all Plaintiffs allege is that both IBM and Kyndryl shared the "polic[ies] and practices of targeting for layoff and disproportionately ending the employment of employees" aged 40 and older. Compl. ¶ 33. But they fail to plead any facts at all relevant to the other factors courts consider, such as whether IBM and Kyndryl shared a human resources department. *See Juhua Han*, 2020 WL 2614726, at \*9. In the end, the Court thus readily concludes that Plaintiffs do not plausibly allege a "centralized control of labor relations." *Griffin*, 835 F.3d at 292 (quoting *Cook*, 69 F.3d at 1240).

Plaintiffs, moreover, also fail to allege any facts plausibly suggesting the existence of the remaining two factors—"common management" and "common ownership or financial control." *Griffin*, 835 F.3d at 292 (quoting *Cook*, 69 F.3d at 1240).

Accordingly, Plaintiffs' claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, are dismissed to the extent they rely on a "single employer" theory of liability.

36

### C. "Joint Employer" Theory

Next is Plaintiffs' assertion that IBM is liable under a "joint employer" theory of liability.

As with the "single employer" theory, Plaintiffs and IBM rely on the law of the Second Circuit and the courts within it to identify the factors relevant to whether entities are a "joint employer" in a federal employment discrimination context. DeGruccio does not suggest that a different interpretation of the "joint employer" relationship applies to the FEHA. Both Plaintiffs and IBM, therefore, "implied[ly] consent" to the application of the Second Circuit's law on "joint employer" relationships to their ADEA and FEHA claims. *Tehran-Berkeley Civ. & Env't Eng'rs*, 888 F.2d at 242.

Like the "single employer" theory of liability, the "joint employer" doctrine "allow[s] a plaintiff to assert employer liability . . . against entities that are not her formal, direct employer." *Griffin*, 835 F.3d at 292 (quoting *Barbosa*, 716 F. Supp. 2d at 216). Unlike the "single employer" relationship, though, "there is no single integrated enterprise." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2205) (quoting *Clinton's Ditch Coop. Co.*, 778 F.2d at 137). "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Id.*

"[A] joint employer relationship [exists] when two or more entities, according to common law principles, share significant control of the same employee." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022). "Broadly," courts "examine whether the alleged employer 'paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities.'" *Id.* (alteration in original) (quoting *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015)); *see also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005) (suggesting these factors apply in the ADEA context). "'[T]he element of control'" is the "crux" of the inquiry.

37

*Felder*, 27 F.4th at 843 (quoting *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006)). More specifically, the factors courts consider include

> [t]he hiring party's right to control the manner and means by which the product is accomplished . . . [;] the skill required; the source of the instrumentalities and tools [for the work]; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Gulino*, 460 F.3d at 371) (second alteration in original). "Though no single factor is dispositive, the 'greatest emphasis' should be placed on the first factor—that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (citation omitted) (quoting *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993)).

Plaintiffs allege that "IBM has been involved in, and is behind, Kyndryl's continuation of IBM's discriminatory layoffs." Compl. ¶ 19. But the details they provide are wholly insufficient to render IBM's control plausible. Plaintiffs allege no facts indicating that Kyndryl has anything but complete control over the "manner and means" by which its employees complete their work. *Felder*, 27 F.4th at 843 (quoting *Gulino*, 460 F.3d at 371). They do allege that Kyndryl took over IBM's managed infrastructure business about a year and half before laying them off, *see* Compl. ¶¶ 4–5, 17, and that Kyndryl provided laid-off employees the benefit of resources on IBM URLs, *see id.* ¶ 19. But neither these facts nor the fact that Kyndryl and IBM employed similar language and severance packages, *see* Compl. ¶ 19, plausibly suggests "the element of control," *Felder*, 27 F.4th at 843 (quoting *Gulino*, 460 F.3d at 371).

As a result, Plaintiffs' claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), and FEHA, Cal. Gov't Code §§ 12940(a), 12941, are dismissed to the extent they rely on a "joint employer" theory of liability.

### D.  Former Employer Interference Theory

Finally, there remains the question of whether Doheny states a plausible claim for retaliation under the ADEA, 29 U.S.C. § 623(d), based on an interference theory of liability. A former employer can retaliate against a former employee by interfering with the former employee's "tangible future employment objectives." *Wanamaker v. Columbian Rope Co*., 108 F.3d 462, 466 (2d Cir. 1997) (emphasis omitted). For example, a former employer may be liable for retaliation if it "'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." *Id*. (citations omitted); *see also Calise v. Casa Redimix Concrete Corp.*, No. 20-CV-7164, 2022 WL 355665, at *6 (S.D.N.Y. Feb. 4, 2022) ("As courts in this Circuit have recognized, blacklisting, or interfering with future employment opportunities, can constitute an adverse employment action.").

Doheny alleges that she was subject to retaliation because she was laid off from Kyndryl one day after she resolved a discrimination claim against IBM. Compl. ¶ 22. But she alleges no facts indicating what *IBM* did to induce her layoff from Kyndryl. She does not, for example, claim that IBM called Kyndryl and "sullied her reputation" or otherwise interfered with her relationship with Kyndryl, resulting in her layoff. *Wanamaker*, 108 F.3d at 466. She thus fails to state a plausible claim for retaliation under the ADEA, 29 U.S.C. § 623(d), against IBM, and her claim is dismissed.

**CONCLUSION**

For the foregoing reasons, Kyndryl's motion to dismiss is granted in part and denied in part, and IBM's motion to dismiss is granted in full.

To summarize the Court's conclusions regarding Plaintiffs' claims against Kyndryl:

- Doheny states a plausible individual claim for age discrimination under the ADEA, 29 U.S.C. § 623(a)(1), based on a disparate-treatment theory of liability. This claim survives only as to her layoff.

- Doheny states a plausible collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a)(1), based on a pattern-or-practice theory of liability. This claim survives only as to Kyndryl's alleged practice of targeting employees aged 40 and over for layoff.

- Doheny fails to state a plausible individual or collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a)(2), based on a disparate-impact theory of liability.

- Doheny fails to state a plausible claim for retaliation under the ADEA, 29 U.S.C. § 623(d).

- DeGruccio fails to state a plausible individual or collective/class claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), or FEHA, Cal. Gov't Code §§ 12940(a), 12941, because he agreed to release or otherwise arbitrate individual claims and to waive any class or collective ones.

- Plaintiffs' collective claim for age discrimination under the ADEA, 29 U.S.C. § 623(a), is dismissed as to the four opt-in plaintiffs because they also agreed to waive any collective claim and to refrain from opting into a suit based on such a claim.

With respect to Doheny, all claims against Kyndryl that are dismissed are done so without prejudice. As to DeGruccio and the opt-in plaintiffs, all claims against Kyndryl are dismissed with prejudice in light of their agreements. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (holding that dismissal with prejudice is proper where there is no indication the plaintiff could provide additional allegations leading to a different result).

To summarize the Court's conclusions regarding Plaintiffs' claims against IBM:

- Doheny and DeGruccio fail to state plausible individual or collective/class claims for age discrimination under the ADEA, 29 U.S.C. § 623(a), or FEHA, Cal. Gov't Code §§ 12940(a), 12941, based on "alter ego," "single employer," and "joint employer" theories

of liability.

- Without a surviving collective claim under the ADEA, 29 U.S.C. § 623(a), there remains no basis upon which the unnamed plaintiffs may opt into the suit.

- Doheny fails to state a plausible claim for retaliation under the ADEA, 29 U.S.C. § 623(d), based on an interference theory of liability.

All claims against IBM are dismissed without prejudice.

Plaintiffs shall have 30 days to amend their Complaint, provided they have a good faith basis for doing so. *See, e.g.*, *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008); *see also* Fed. R. Civ. P. 15(a)(2) (instructing that "[t]he court should freely give leave [to amend] when justice so requires"); *Williams v. Citigroup Inc*., 659 F.3d 208, 212 (2d Cir. 2011) (describing Rule 15(a)(2) as "permissive"). The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 30 and 34.

Dated:   February 1, 2024
         New York, New York

 

Ronnie Abrams
United States District Judge