UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                        :

MARYKATHRYN DOHENY,                :

                                   :

                   Plaintiff,      :

                                 :                23-CV-3962 (JAV)

        -v-                   :

                                 :         OPINION AND ORDER

INTERNATIONAL BUSINESS MACHINES  :
CORP., and KYNDRYL HOLDINGS, INC.,  :

                                 :

                 Defendants.    :

                                 :

-------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

Plaintiff MaryKathryn Doheny ("Plaintiff" or "Doheny") brings this action against her former employers, Defendants Kyndryl Holdings, Inc.[1] ("Kyndryl") and International Business Machines Corp. ("IBM"), alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), (d) in connection with her 2022 layoff. ECF No. 74 ("Second Amended Complaint" or "SAC") at 1, 10. Presently before the Court are Kyndryl's motion to dismiss in part Plaintiff's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and IBM's motion to dismiss in full the Second Amended Complaint. ECF Nos. 76 (the "Kyndryl Motion"), 78 (the "IBM Motion"). For the following reasons, the Kyndryl Motion and the IBM Motion are **GRANTED**.

---

[1] Kyndryl Holdings, Inc. argues that Plaintiff improperly named it as a defendant because it is Kyndryl, Inc. that employed Plaintiff. ECF No. 77 ("Kyndryl Mem.") at 1 n.1. At this stage of litigation, however, the Court accepts as true Plaintiff's allegation that Kyndryl Holdings, Inc. employed Plaintiff. *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025).

## BACKGROUND

### A.    First Amended Complaint

On May 11, 2023, Plaintiff Doheny filed suit against Kyndryl and IBM.  ECF No. 1.  The action was originally assigned to District Judge Ronnie Abrams.

On May 26, 2023, Doheny filed an amended complaint.  ECF No. 8 ("First Amended Complaint" or "FAC").  The First Amended Complaint asserted individual and collective claims for age discrimination and retaliation under the ADEA, as well as individual and class claims for age discrimination under the California Fair Employment and Housing Act ("FEHA").  *Id.* at 1, 8-11.

According to the First Amended Complaint,[2] Doheny worked for IBM for 23 years as a certified client executive.  ECF No. 8 ("FAC"), ¶ 4.  In 2021, IBM spun off a new company, which was later named "Kyndryl," to take over its managed infrastructure business.  *Id.*, ¶ 17.  Kyndryl designs, builds, and manages enterprise IT infrastructure solutions.  *Id.*  In September 2021, Doheny began working for Kyndryl as a director of global software.  *Id.*, ¶ 21.

In March 2023, one day after she resolved a claim of discrimination against IBM, Doheny learned she was going to be laid off from Kyndryl as part of a "Resource Action" on April 14, 2023.  *Id.*, ¶¶ 21-23.  After learning of her layoff, Doheny started looking for other positions within Kyndryl.  *See id.*, ¶¶ 23, 25.  At

---

[2] The following facts are accepted as true and construed in the light most favorable to the Plaintiff for the purposes of this motion.  *Xeriant*, 141 F.4th at 411.

the time of her layoff, she "was one of the oldest members of her team" and "had an excellent work record." *Id.*, ¶ 21.

Doheny contends that her layoff occurred in accordance with Kyndryl's "playbook of age discrimination." *Id.*, ¶ 18. She alleges that she was laid off as part of a "continued targeting of older workers for termination. *Id.*, ¶ 24. Doheny also alleges that Kyndryl ensured "that older employees exited the company after being selected for layoff by preventing them from obtaining open positions at the company." *Id.*, ¶ 25. Relying on public reporting, she notes that Kyndryl "recently laid off hundreds of employees, . . . app[arently] . . . includ[ing] a disproportionately high number of employees over the age of [40]." *Id.*, ¶ 18. Of the 420 U.S. workers recently tapped for possible layoff, for example, 156 employees with an average age of 55 were ultimately laid off, while the remaining 264 workers, whose average age was 52, were transferred to other positions. *See* Thomas Claburn, *Leaked Kyndryl Files Show 55 was Average Age of Laid-Off US Workers*, The Register (May 24, 2023), https://www.theregister.com/2023/05/24/kyndryl_ibm_layoffs; FAC, ¶ 18.[3] Meanwhile, the average age of employees in Kyndryl's mainframe group is 35, and the median age for U.S. workers in the "data processing, hosting, and related services" and "computer systems design and related services" sectors is 37.0 and 40.8, respectively. *Id.* (quoting U.S. Bureau of Lab. Stat., *Employed Persons by*

---

[3] Doheny does not append The Register's reporting to the Second Amended Complaint. Nonetheless, the Court finds it incorporated by reference because the Second Amended Complaint contains "a clear, definite, and substantial reference" to the reporting. *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020) (citation omitted).

*Detailed Industry and Age*, Lab. Force Stat. from the Current Population Surv. (last modified Jan. 25, 2023), https://www.bls.gov/cps/aa2022/cpsaat18b.htm).[4]

According to Doheny, both Kyndryl and IBM are to blame for her termination as Kyndryl has "continued IBM's playbook of age discrimination," a choice she says IBM "has been involved in[] and is behind."  FAC, ¶¶ 18-19.  She observes that numerous charges of age discrimination have been levied against IBM in recent years, playing out through court, administrative, and arbitration proceedings, as well as in the press.  *Id.*, ¶¶ 11-16.  She also notes that Kyndryl and IBM both label their layoffs "Resource Actions," and Kyndryl provided resources to its laid-off employees through IBM URLs.  *Id.*, ¶ 19.  Additionally, the severance package Kyndryl provided "to laid-off employees appears to be based on" IBM's severance package since they use the "same language, font, and spacing."  *Id.*

On these allegations, Doheny brought age discrimination and retaliation claims under the ADEA against Kyndryl and IBM.  Her age discrimination claim against Kyndryl was brought under disparate treatment and disparate impact theories of liability.  ECF No. 56 ("Opinion & Order" or "O&O") at 8, 14.

Plaintiff's disparate treatment claims were premised on her layoff and failure to be rehired at Kyndryl.  *Id.* at 10.  Doheny also sought to hold IBM liable

---

[4] Relying on The Register's reporting, Doheny alleges that the average age of Kyndryl's workforce is 35.  SAC, ¶ 18.  But the reporting in fact indicates that 35 is the average age of the workers in Kyndryl's *mainframe group*.  Claburn, *Leaked Kyndryl Files Show 55 was Average Age of Laid-Off US Workers*, The Register (May 24, 2023), https://www.theregister.com/2023/05/24/kyndryl_ibm_layoffs.  The reporting, incorporated into the Second Amended Complaint by reference, controls.  *See Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008).

for these violations of the ADEA on the grounds that: (1) Kyndryl was IBM's alter ego, (2) Kyndryl and IBM were a single employer, and (3) Kyndryl and IBM were a joint employer. *Id.* at 25-26. Plaintiff claimed that Kyndryl had retaliated against her based upon her settlement of her age discrimination claim with IBM. *Id.* at 39. Doheny's retaliation claim against IBM was premised on an interference theory of liability. *Id.*

**B.      Motions to Dismiss First Amended Complaint**

On June 30, 2023, Kyndryl and IBM each filed a motion to dismiss the First Amended Complaint pursuant to Rule 12(b)(6). ECF Nos. 30, 34. On February 1, 2024, Judge Abrams issued her Opinion & Order granting in part and denying in part Kyndryl's motion and granting IBM's motion.

Regarding Doheny's individual age discrimination and retaliation claims against Kyndryl, Judge Abrams held that Doheny had pled a plausible disparate treatment claim based on her layoff but otherwise dismissed Doheny's claims without prejudice. *Id.* at 40. Judge Abrams dismissed Doheny's disparate treatment claim premised on her failure to be rehired at Kyndryl as implausible considering that hundreds of other employees, whose average age was 52 and who were originally identified for layoff, were transferred to a new position. *Id.* at 11. Judge Abrams dismissed Doheny's disparate impact claim because she failed to identify a specific employment practice or policy leading to the alleged disparate impact. *Id.* at 17. Judge Abrams dismissed Doheny's retaliation claim because she

did not allege facts that indicated Kyndryl knew of her previous discrimination claim against IBM. *Id.* at 19.

Judge Abrams also dismissed all claims brought against IBM without prejudice. *Id.* at 40-41. With respect to alter ego liability, Judge Abrams found that the First Amended Complaint did not sufficiently allege fraud or domination by IBM. *See id.* at 32-33. Judge Abrams similarly dismissed claims based upon a single employer theory of liability, because Plaintiff did not allege facts from which it could be inferred that IBM made the final decision regarding her layoff or any transfer inquires. *See id.* at 34-36. Further, the First Amended Complaint did not include non-conclusory allegations regarding IBM's control over Kyndryl, as is required under a joint employer theory of liability. *See id.* at 38. Judge Abrams dismissed Doheny's retaliation claim because Doheny failed to plead any facts indicating what IBM did to induce her layoff from Kyndryl. *Id.* at 39.

Judge Abrams gave Doheny leave to replead her claims to correct these deficiencies, provided she had a good faith basis for doing so. *Id.* at 41.

## C.    Second Amended Complaint

On November 14, 2024, Doheny filed the Second Amended Complaint. The Second Amended Complaint is substantially similar to the First Amended Complaint, but includes new allegations mainly relating to Doheny's actions

following the receipt of her layoff notification, as well as the interconnectedness of Kyndryl and IBM.  *See* SAC, ¶¶ 16, 22, 24-27, 30-32.

Plaintiff now alleges that upon learning of her layoff, she started looking for other positions within Kyndryl.  *Id.*, ¶ 30.  She contacted several senior managers and company leaders; while some responded and others did not, none indicated that they could hire her.  *Id.*  Even after receiving strong letters of recommendation from Kyndryl Global Vice President of Software Elton Passos, who was Doheny's manager, and Kyndryl Vice President and Senior Counsel George O'Hanlon, who had worked closely with Doheny at IBM and Kyndryl, she still had no success at finding other work within Kyndryl.  *Id.*, ¶¶ 31-32.  Although she sought an extension of time to May 15, 2023, to find a new position within Kyndryl, her request was denied.  *Id.*, ¶ 32.

Concerning the interconnectedness of Kyndryl and IBM, the Second Amended Complaint identifies several individuals who worked as corporate executives or managers at IBM who became senior leaders at Kyndryl.  *Id.*, ¶¶ 16, 24.  Additionally, pursuant to a transition services agreement, Kyndryl paid IBM hundreds of millions of dollars for financial and business operations systems between 2021 and 2023.  *Id.*, ¶ 22.  Doheny also notes that, in March 2023, she received an email congratulating her for 25 years of service at Kyndryl, reflecting Kyndryl's policy to credit employees' prior tenure at IBM.  *Id.*, ¶ 25.  In October 2024,  Doheny also received a mailing targeted to "IBM Medicare-eligible

participants" that encouraged her to participate in an IBM-sponsored plan. *Id.*, ¶ 26.

## LEGAL STANDARDS

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all well-pleaded allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [the standard] requires more than labels[,] conclusions, and a formulaic recitation of a cause of action's elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "The Court's charge in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004)).

## DISCUSSION

Kyndryl moves to dismiss Doheny's retaliation ADEA claim, her disparate impact ADEA claim, and her disparate treatment ADEA claim based upon her attempt to transfer to a new position following her layoff, arguing that the

allegations in the Second Amended Complaint fail to correct the deficiencies identified by Judge Abrams in her Opinion & Order.  *See* Kyndryl Mem. at 5-17. IBM moves to dismiss Doheny's claims against it in full, arguing that the Second Amended Complaint, like the Amended Complaint, fails to plausibly allege IBM's liability under an alter ego, joint employer, or single employer theory, or that IBM retaliated against Plaintiff by interfering with her employment with Kyndryl.  *See* ECF No. 79 ("IBM Mem.") at 3-12.

The Second Amended Complaint did not remedy any of the pleading deficiencies identified by Judge Abrams in her prior Opinion & Order.  Accordingly, these claims are dismissed with prejudice.

## A.    Claims Against Kyndryl

Kyndryl moves to dismiss Doheny's disparate treatment claim insofar as it is based on allegations that Kyndryl prevented Doheny from obtaining a new position with Kyndryl, Doheny's disparate impact claim, and Doheny's retaliation claim. Kyndryl Mem. at 9, 12, 13.  The Court considers each claim in turn.

### 1.    Age Discrimination Claim Under a Disparate Treatment Theory

For an age discrimination claim based on a disparate treatment theory to survive a Rule 12(b)(6) motion, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her]," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015), and (2) the employer would not have taken the adverse action but for her age, *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021).  "Evidence of an employer's general practice of

9

discrimination may be highly relevant to an individual disparate treatment" claim. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012).

Applying these principles, Judge Abrams previously held that the First Amended Complaint failed to state a disparate treatment claim. O&O at 11. Doheny had not alleged facts from which a reasonable inference could be drawn that Kyndryl prevented Doheny from transferring to a new position within Kyndyl "'but for' her age." *Id.* at 11. Specifically, "[t]he alleged circumstances surrounding Doheny's transfer efforts . . . render it implausible that she would have been prevented from transferring 'but for' her age" because "according to the reported statistics on which Doheny otherwise relies, of the 420 employees originally identified for layoff, 264 employees, whose average age was 52, were transferred to a new position." *Id.* "Kyndryl thus appears to have transferred many employees aged 40 and older; Doheny was just not among that group." *Id.*

The new allegations included in the Second Amended Complaint not only fail to remedy the issue with Doheny's disparate treatment claim identified by Judge Abrams, they render her claim even more implausible. In the First Amended Complaint, Doheny alleged that she "attempted to inquire about other open positions at the company but did not receive responses to her inquiries." FAC, ¶ 25. Doheny now alleges that some, but not all, of the individuals she contacted at Kyndryl responded to her requests for employment, but declined to hire her, SAC, ¶ 30; and concedes that individuals at Kyndryl helped her apply to other positions within the company by providing her with glowing letters of recommendation, *id.*,

10

¶ 31. No reasonable inference of racial animus can be drawn from these allegations. Plaintiff also complains that Kyndryl denied her request to extend her employment to May 15, 2023, to provide her additional time to obtain a new position. *Id.*, ¶ 32. Yet nothing in that denial is suggestive of discrimination on the basis of age. Accordingly, Plaintiff's age discrimination claim based on the failure to transfer or rehire is dismissed with prejudice.

### 2.    Age Discrimination Claim Under a Disparate Impact Theory

For an age discrimination claim based on a disparate impact theory to survive a Rule 12(b)(6) motion, a plaintiff "need not plead a prima facie case," but instead need only "set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020). Accordingly, the plaintiff must provide factual allegations that plausibly "(1) identify a specific[,] [neutral] employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Id.* at 207 (quoting *Chin*, 685 F.3d at 151); *see also Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2d Cir. 1992) (describing the elements of a disparate impact ADEA claim as the "identif[ication of] a specific employment practice having an adverse impact upon members of the protected class" and a "show[ing] [of] causation").

To identify a specific, neutral employment policy, a plaintiff must identify the "criteria," *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987-988 (1988), "specific test, requirement, or practice within [the policy] that has an adverse impact on

11

older workers," *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *see also Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C. Cir. 2019) ("[W]here the object of the suit is an identifiable practice, criterion, or bundle of criteria behind a specified employment event like [a] rash of contemporaneous layoffs . . . , disparate impact analysis applies."). Merely alleging a "generalized policy," *Smith*, 544 U.S. at 241, or an "imbalance in the work force," *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(k), does not suffice.

Judge Abrams previously ruled that the First Amended Complaint failed to state a disparate impact claim because it did not identify a specific employment practice or policy. O&O at 17. Doheny concedes that in her Second Amended Complaint she "did not assert any new allegations specifically regarding a disparate impact theory." ECF No. 86 ("Opp'n") at 19. Accordingly, her disparate impact claim is dismissed with prejudice.

### 3.    Retaliation Claim

The ADEA prohibits retaliation by rendering it "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by [§ 623], or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). "[F]or a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment

12

action—against [her]" (2) because she opposed an employment practice unlawful under the ADEA or participated in an investigation, proceeding, or litigation under it. *Vega*, 801 F.3d at 90; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (applying the standard for Title VII retaliation claims to ADEA claims). Termination is an example of an adverse employment action. *See, e.g., Schiano v. Quality Payroll Sys, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006). "As for causation, a plaintiff must plausibly plead a connection between the [adverse] act and [her] engagement in protected activity," *Vega*, 801 F.3d at 90, such that "that the adverse action would not have occurred in the absence of the retaliatory motive," *Lively*, 6 F.4th at 307 (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). A plaintiff can do so (1) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant" or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015). Indirect causation requires the employer to have known that the employee engaged in protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011).

Plaintiff's retaliation claim in the First Amended Complaint was dismissed for failure to plausibly allege causation. O&O at 19. Judge Abrams found that Doheny did not allege facts supporting the notion that Kyndryl even knew of her

13

age discrimination claim against IBM, "let alone that she was fired because of it." *Id.*

Although the Second Amended Complaint includes new allegations to bolster her retaliation claim, *see* SAC, ¶¶ 16, 22, 24-27, these allegations do not sufficiently plead knowledge or the requisite causal connection.  The Second Amended Complaint now asserts that numerous leaders and managers have worked at both IBM and Kyndryl, SAC, ¶¶ 16, 24; IBM provided financial and business operations systems to Kyndryl pursuant to a transition services agreement, *id.*, ¶ 22; and Doheny received communications from Kyndryl and IBM reflecting recognition of the fact that she previously worked at IBM, *see id.*, ¶¶ 25, 26.  The Second Amended Complaint thus contends that "[i]t is apparent that Kyndryl's and IBM's human resources departments worked in conjunction," *id.*, ¶ 22, such that "the Court can infer that Kyndryl knew about Plaintiff's settlement with IBM," Opp'n at 11.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  From Doheny's new allegations, however, the Court can only infer a mere possibility that Kyndryl was aware of Plaintiff's previous age discrimination complaint against IBM.  Doheny's Second Amended Complaint does not allege, for example, that any of the leaders and managers who now work at Kyndryl would have been in a position to have known of her age discrimination complaint when previously employed at IBM.  She does not even identify "which employee of the defendant had knowledge of [her] protected activity."  *Majeed v.*

14

*ADF Companies*, No. 11-CV-5459 (SJF) (ETB), 2013 WL 654416, at \*11 (E.D.N.Y. Feb. 20, 2013); *accord Khaleel v. Metro One Loss Prevention Servs. Grps.*, 469 F. Supp. 2d 130, 134 (S.D.N.Y. 2007).  Nor can it reasonably be inferred from Plaintiff's allegations that IBM and Kyndryl had a shared human resources department, with overlapping personnel or functionality.  Doheny's retaliation claim thus fails to cross the line from possible to plausible.

**B.    Claims Against IBM**

Plaintiff has likewise failed to remedy the deficiencies identified in Judge Abram's Opinion & Order with respect to the age discrimination claims asserted against IBM under alter ego, single integrated enterprise, or joint employer theories of liability.  Nor has she adequately alleged that IBM, as her former employer, interfered with her employment at Kyndryl for retaliatory reasons.  The claims against IBM are therefore dismissed in their entirety.

**1.    Alter Ego Theory**

For the reasons stated in the Opinion & Order, either Delaware law or the federal common law applies to Doheny's claim for age discrimination under the ADEA.  *See* O&O at 27-29.

"To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (alteration in original) (quoting *Harper v. Delaware Valley Broads., Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990), *aff'd*, 932

15

F.2d 959 (3d Cir. 1991)).  Among the factors indicative of whether two corporations

operate as a "single economic entity" are

> [w]hether the corporation was adequately capitalized for
> the corporate undertaking; whether the corporation was
> solvent; whether dividends were paid, corporate records
> kept, officers and directors functioned properly, and other
> corporate formalities were observed; whether the
> dominant shareholder siphoned corporate funds; and
> whether, in general, the corporation simply functioned as
> a facade for the dominant shareholder.

*Id.* at 1458 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. A-CV-1331, 1989

WL 110537, at *4 (Del. Ch. Sep. 19, 1989)).

To pierce the corporate veil under the federal common law, a plaintiff must

show that the controlling corporation "perpetrate[d] a fraud or . . . so dominated and

disregarded the corporate entity's form that the entity primarily transacted the

[dominated entity's] personal business rather than its own corporate business."

*Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986)

(cleaned up).  As to domination, courts apply ten factors to determine whether one

corporate entity so dominates another such that an "alter ego" relationship exists.

*See, e.g.*, *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures*, LLC, 851 F.

Supp. 2d 504, 509-10 (S.D.N.Y. 2012).  Those ten factors are:

> (1) disregard of corporate formalities;
>
> (2) inadequate capitalization;
>
> (3) intermingling of funds;
>
> (4) overlap in ownership, officers, directors, and
>     personnel;

16

(5) common office space, address and telephone numbers of corporate entities;

(6) the degree of business discretion shown by the allegedly dominated corporation;

(7) whether the dealings between the entities are at arms length;

(8) whether the corporations are treated as independent profit centers;

(9) payment or guarantee of the corporation's debts by the dominating entity, and

(10) intermingling of property between the entities.

*Id.*

Applying both bodies of law, Judge Abrams previously held that the First Amended Complaint failed to plausibly allege that Kyndryl was acting as the alter ego of IBM. O&O at 30. Regarding Delaware law, Judge Abrams reasoned that Doheny did not allege "that Kyndryl and IBM 'operated as a single economic entity' nor any facts relevant to [the applicable] factors." *Id.* at 31 (citation omitted). Doheny also failed to plausibly allege the presence of an element of injustice or unfairness. *Id.* Regarding the ten factors considered under federal common law, the First Amended Complaint did not allege any facts relevant to factors one through five or seven through ten. *Id.* at 32. As to factor six, the relevant allegations were insufficient to plausibly suggest that IBM completely dominated Kyndryl. *Id.*

As with her prior pleading, Doheny's Second Amended Complaint largely fails to address any of the relevant factors. Plaintiff has not added any allegations

17

that go to disregard of corporate formalities, inadequate capitalization, intermingling of funds, arms-length business dealings, independent profit centers, payment or guarantee of debt, or intermingling of property.  As to overlap of personnel, Plaintiff identifies seven members of Kyndryl's leadership team who were previously employed at IBM.  SAC, ¶ 16.  The Second Amended Complaint, however, does not allege that any of these individuals worked at both IBM and Kyndryl at the same time.  *See id.*  There are thus no allegations of any actual overlap of personnel between Kyndryl and IBM.

In support of its assertion that "Kyndryl's and IBM's human resources departments worked in conjunction," the Second Amended Complaint alleges that IBM provided "services" and "financial and business operations system[s]" to Kyndryl pursuant to a transition services agreement.  *Id.*, ¶ 22.  The Second Amended Complaint does not assert that the services and systems under the transition services agreement were provided to Kyndryl's human resources department.  *See id.*  The provision of transition services, without more, does not give rise to a reasonable inference that IBM dominated Kyndryl's decision-making or that IBM and Kyndryl operated as a single economic entity.  *See id.*

Finally, Doheny alleges that she received communications from Kyndryl and IBM acknowledging her prior employment at IBM and crediting those years of service of her employment at Kyndryl.  *See id.*, ¶¶ 25, 26.  These allegations do not demonstrate the type of pervasive dominion that would allow this Court to

18

disregard corporate form.  Accordingly, Doheny's claims against IBM based upon alter ego liability are dismissed.

    2.    **Single Employer Theory**

The single employer theory of liability "allow[s] a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (citation omitted), *certified question accepted*, 60 N.E.3d 420 (N.Y. 2016), *and certified question answered*, 76 N.E.3d 1063 (N.Y. 2017).  "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise.'" *Id.* (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)).  Under the "single employer doctrine," "an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity, may impose liability . . . on another entity comprising part of the single integrated employer." *Id.* (quoting *Fowler v. Scores Holding Co.*, 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009)).

Courts generally rely on four factors "[t]o determine whether two separate entities should be considered a single employer for the purposes of employment discrimination claims:  (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Id.* (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *see Dewey v. PTT Telecom Netherlands, U.S., Inc.*, 101 F.3d 1392 (2d Cir. 1996)

19

(unpublished table decision) (applying the four factors in the context of an ADEA claim).

Regarding the "interrelation of operations," courts look to:

(1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising;

(2) whether the two entities shared employees, services, records and equipment;

(3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines;

(4) whether the parent maintained the subsidiary's books;

(5) whether the parent issued the subsidiary's paychecks; and

(6) whether the parent prepared and filed the subsidiary's tax returns.

*Juhua Han v. Kuni's Corp.*, No. 19-CV-6265 (RA), 2020 WL 2614726, at *9 (S.D.N.Y. May 22, 2020) (quoting *Schade v. Coty, Inc.*, No. 00-CV-1568 (JGK), 2001 WL 709258, at *7 (S.D.N.Y. June 25, 2001)).

As to the centralized control of labor relations, courts generally consider

whether the subsidiary has a separate human resource department[;] whether the [controlled entity] establishes its own policies and makes it[s] own decisions as to the hiring, discipline, and termination of its employees[;] whether employment applications are sent to the [controlled entity] [;] whether the [controlled entity] must clear all major employment decisions with the [controlling entity] [;] and whether the [controlling entity] routinely shifts employees between the two companies.

20

*Id.*, at \*9 (quoting *Schade*, 2001 WL 709258, at \*8).  Ultimately, though, the key "question is '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (quoting *Cook*, 69 F.3d at 1240).

Judge Abrams held that the First Amended Complaint failed to plausibly allege that Kyndryl and IBM constitute a single employer.  O&O at 36.  Besides conclusorily asserting that "IBM and Kyndryl shared the 'polic[ies] and practices of targeting for layoff and disproportionately ending the employment of employees' aged 40 and older," Doheny failed to plead facts relevant to any of the relevant factors.  *Id.*

Doheny's Second Amended Complaint does not remedy these pleading deficiencies.  Plaintiff does not include any allegation that goes to the interrelatedness of operations, common management, or common ownership or control.  The Second Amended Complaint points to a single example of a Kyndryl employee that returned to IBM, SAC, ¶ 24, but this hardly indicates that shifting of employees between companies was "routine."

With respect to the centralized control of labor relations, the factor of most relevance, the Second Amended Complaint includes the conclusory assertion that "Kyndryl's and IBM's human resources departments worked in conjunction."  *Id.*, ¶ 22.  If anything, this allegation appears to confirm that the two companies had separate human resources departments.  The Second Amended Complaint does not allege that the departments shared common policies, that any IBM human

21

resources personnel reviewed Kyndryl employment applications, or that any IBM human resources personnel were involved in Kyndryl's decisions to hire, fire, or discipline its employees.  The Second Amended Complaint does not even specify how these departments purportedly worked "in conjunction."

The Second Amended Complaint cites a report in which Kyndryl admits to continued reliance on IBM's "services" and "financial and business operations systems" pursuant to its transition services agreement.  *Id.*  Nothing in that report indicates that the companies shared Human Resources functionality, however.  *Id.*  Plaintiff also alleges that Kyndryl directed employees who had been laid off to an IBM URL to access Kyndryl's outplacement portal to assist her in identifying a new job.  *Id.*, ¶ 23.  Kyndryl's continued use of an IBM URL, however, is not a sufficient basis to infer that IBM and Kyndryl operated as a single employer.  Consequently, Doheny's age discrimination claim against IBM based on a single employer theory is dismissed.

### 3.   Joint Employer Theory

Like the single employer theory of liability, the joint employer doctrine "allow[s] a plaintiff to assert employer liability . . . against entities that are not her formal, direct employer."  *Griffin*, 835 F.3d at 292 (quoting *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010)).  Unlike the single employer relationship, though, "there is no single integrated enterprise."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2025) (quoting *Clinton's Ditch Coop. Co.*, 778 F.2d at 137).  "A conclusion that employers are 'joint' assumes

that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Id.*

"[A] joint employer relationship [exists] when two or more entities, according to common law principles, share significant control of the same employee." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022). "Broadly," courts "examine whether the alleged employer 'paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities.'" *Id.* (quoting *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015)); *see also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005) (suggesting these factors apply in the ADEA context). "'[T]he element of control'" is the "crux" of the inquiry. *Felder*, 27 F.4th at 843 (quoting *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006)). More specifically, the factors courts consider include

> [t]he hiring party's right to control the manner and means by which the product is accomplished . . . [;] the skill required; the source of the instrumentalities and tools [for the work]; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Gulino*, 460 F.3d at 371). "Though no single factor is dispositive, the 'greatest emphasis' should be placed on the first factor—that is, on the extent to which the hiring party controls the 'manner and means' by which the worker

23

completes his or her assigned tasks." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (citation omitted).

Applying these principles, Judge Abrams held that the First Amended Complaint failed to plausibly allege that IBM is a joint employer of Doheny.  O&O at 38.  As Judge Abrams observed, Plaintiff alleged "no facts indicating that Kyndryl has anything but complete control over the 'manner and means' by which its employees complete their work."  *Id.*  And the allegations that Kyndryl provided laid-off employees the benefit of resources on IBM URLs, or that Kyndryl and IBM employed similar language and severance packages, did not plausibly suggest "the element of control."  *Id.*

The Second Amended Complaint fares no better.  None of the new allegations indicate that Kyndryl has anything but complete control over the "manner and means" by which its employees complete their work.  *See* SAC, ¶¶ 16, 22, 24-27, .  Plaintiff argues that the joint employer theory involves a fact-intensive inquiry that cannot be decided at the pleading stage.  Opp'n at 21.  Yet comparing the allegations here to the cases cited by Plaintiff only highlights the pleading deficiencies in the Second Amended Complaint.

In *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460 (E.D.N.Y. 2015), for example, the district court found that allegations that employees performed all their work on a premises owned by the defendant company, that their supervisors were hired by and employed by the defendant company, and that those supervisors in turn directed and managed all aspects of the performance of their duties, were

24

sufficient to state a claim for joint employer liability. *Id.* at 464-65. Plaintiff here does not include any allegations establishing that current IBM managers exercised any such control over her day-to-day work performance.

In *Hayes v. Waddell & Reed, Inc.*, the district court permitted claims premised on a joint employer and single employer theory to proceed where the complaint alleged, *inter alia*, that the two defendant companies used a common job application, that corporate employees from both companies conducted job interviews, that managers from both companies assigned the plaintiff her job duties and dictated her work hours, that she reported to supervisors at both companies, that she received compensation from both companies, and that personnel from both companies had been involved in termination decisions. No. CA 12-293 Erie, 2013 WL 5434139, at \*9-10 (W.D. Pa. Sept. 26, 2013). These detailed factual allegations stand in stark contrast to the thin assertions of corporate control at issue here. Accordingly, Doheny fails to plausibly allege that IBM operated as her joint employer.

### 4. Retaliation Claim

A former employer can retaliate against a former employee by interfering with the former employee's "tangible future employment objectives." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (emphasis omitted). For example, a former employer may be liable for retaliation if it "'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." *Id.* (citations omitted); *see also Calise v. Casa*

*Redimix Concrete Corp.*, No. 20-CV-7164 (PAE), 2022 WL 355665, at *6 (S.D.N.Y. Feb. 4, 2022) ("As courts in this Circuit have recognized, blacklisting, or interfering with future employment opportunities, can constitute an adverse employment action.").

Applying these principles, Judge Abrams held that the First Amended Complaint failed to plausibly allege that IBM interfered with her employment at Kyndryl because Doheny "allege[d] no facts indicating what IBM did to induce her layoff from Kyndryl." O&O at 39. The Second Amended Complaint did not correct this deficiency. Accordingly, her retaliation claim against IBM is dismissed with prejudice.

## CONCLUSION

Accordingly, the Kyndryl Motion and the IBM Motion are **GRANTED**. As Doheny has previously been afforded the opportunity to amend her pleadings to address the issues identified in Judge Abrams's 2024 Opinion & Order, O&O at 40-41, no further opportunity to amend the complaint with respect to these issues shall be granted. The Court therefore dismisses with prejudice the following claims: (1) Doheny's age discrimination claim against Kyndryl insofar as it is based on allegations that Kyndryl prevented Doheny from obtaining an open position at Kyndryl, (2) Doheny's age discrimination claim against Kyndryl under a disparate impact theory, (3) Doheny's retaliation claim against Kyndryl, and (4) all remaining claims against IBM. Accordingly, Doheny's only remaining claim is her age discrimination claim against Kyndryl that is premised upon Kyndryl's termination

26

of her employment.  The Clerk of Court is directed to terminate ECF Nos. 76 and
78.

       SO ORDERED.

Dated:  March 31, 2026
       New York, New York
                                JEANNETTE A. VARGAS
                            United States District Judge